UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:01CV-126-H

BETHANIE R. BUSCH                                                                                    PLAINTIFF

V.

ANSELL PERRY, INC.                                                                                  DEFENDANT

**MEMORANDUM OPINION**

To support her claims of warning defect, design defect and breach of warranty, Plaintiff initially submitted Dr. M. Eric Gershwin's expert report.[1]  After Defendant had moved for summary judgment, Plaintiff filed an untimely supplement.  In an opinion dated March 8, 2005, the Court held that federal law pre-empted Plaintiff's failure to warn claim, but not her design defect claim.  The Court also excluded the untimely supplement.  Finally, the Court requested additional briefing on whether Dr. Gershwin's initial expert report was sufficient to support the remaining design defect claim.

Plaintiff's claim arises from her exposure to latex gloves in January 2000 while working at the Norton Hospital in Louisville, Kentucky.  Dr. Gershwin's expert report leaves little doubt that Plaintiff has suffered an allergic reaction from direct tactile exposure to latex and that she has suffered some injury as a result.  Apparently, Plaintiff had no idea that she might be subject to such a latex reaction.  Even had she noticed the federally required warning, it is unlikely to

---

[1] The report contained a comprehensive seven (7) page statement of his analysis and opinions.  It included 139 references to supporting medical literature.

have altered her use of the glove.

I.

The Court's task now is to determine whether Dr. Gershwin's report could lead a reasonable jury to find Defendant's powdered latex gloves defective and unreasonably dangerous.[2] The Court must base its analysis on the evidence of record in this case.[3] In its first Memorandum Opinion, the Court summarized the report and expressed some doubt about its value as to the design claim:

> In his initial report, Dr. Gershwin describes in considerable detail Plaintiff's medical condition and the difficulties associated with it. He thoroughly describes Plaintiff's reaction to the use of latex gloves and the scientific features of the latex reaction. He describes its treatment. As to the latex gloves, Dr. Gershwin opines: that latex is a hazard when inhaled; latex powder increases the likelihood of inhalation; that hospital personnel are particularly at risk and susceptible to latex allergy; and that the warning labels are inadequate. The entire thrust of his opinion is to establish the scientific and practical causation of latex allergic reactions and its consequences. The report contains only limited references to the increased risk associated with powdered latex. The report does not contain an opinion that the latex gloves in question are unreasonably dangerous. Dr. Gershwin's opinions were limited to those of a medical expert, rather than a product expert.

Dr. Gershwin opined that even limited latex exposure can produce allergic reactions and that powdered latex gloves produced a high incidence of allergic reactions due to its airborne and respiratory effects. Dr. Gershwin gave no opinion as to whether Plaintiff's reaction arose from

---

[2] Much of Dr. Gershwin's initial report concerns the adequacy of the product warning in this case. It documents the risks associated with powdered latex gloves that require warning to consumers. Because the Court has held that compliance with federal warning requirements preempts Plaintiff's warning claim, that body of opinion is no longer relevant to our case.

[3] It may be that product experts have provided opinions about the relative feasibility and safety qualities of alternative latex products in other cases. Those persons, if they exist, have not been listed as potential experts in this case.

tactile or airborne exposure.[4]

The last significant aspect of the Court's March 8 Memorandum Opinion was the previously mentioned exclusion of Dr. Gershwin's supplemental expert report. The exclusion has potentially serious consequences for Plaintiff. In that supplement, Dr. Gershwin added three new opinions about the use of powdered latex.[5] The Court carefully considered the new filing and found numerous reasons why it should not be considered. The Court has reviewed that opinion and reaffirms it.[6] The consequence of all this is that Plaintiff's case ends unless she has some other way of showing that Defendant's latex gloves are defective.

II.

The remaining question, therefore, is whether the existing proof, consisting primarily of Dr. Gershwin's original expert report, can support Plaintiff's defective product claim. The Court begins its consideration with a brief review of Kentucky products liability law. In Kentucky, a product is defective and unreasonably dangerous if it creates "such a risk of an accident of the general nature of the one in question that an ordinarily prudent company engaged in the manufacture of such a product would not have put it on the market." *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky. 1984) (quoting *Nichols v. Union Underwear Co., Inc.*, 602 S.W.2d 429, 433 (Ky. 1980)) (internal quotations omitted). This test calls for an

---

[4] From his discussion, one must assume that Plaintiff's injuries were caused by direct use of powdered latex gloves, rather than an airborne exposure. Dr. Gershwin did not opine whether Plaintiff's particular allergic reaction could only have occurred by using powdered gloves.

[5] The Court identified Dr. Gershwin's new opinions as (1) powder is an unnecessary component for proper function of the glove; (2) it increases the likelihood of inhaling latex allergens, and (3) the presence of powder makes the gloves unnecessarily dangerous.

[6] Some of Plaintiff's arguments presented recently amount to a re-argument of those issues. Nevertheless, the Court has given attention to those arguments as necessary.

examination of various factors such as the "feasibility of making a safer product, patency of the danger, warnings and instructions, subsequent maintenance and repair, misuse, and the product's inherently unsafe characteristics." *Montgomery Elevator,* 676 S.W.2d at 780-781. The most common and effective way of proving a product defective is through evidence of a safer, feasible alternative design. *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 42 (Ky. 2004)(concerning the defectiveness of an automobile airbag system).

In *Toyota Motor* Kentucky's highest court directly addressed the need for specific kinds of proof to establish a design defect in any product case. Its analysis is very pertinent to our case:

> In *Jones v. Hutchinson Manufacturing, Inc., supra*, a design defect case involving a grain auger, our predecessor court concluded that "[p]roof of nothing more than that a particular injury would not have occurred had the product which caused the injury been designed differently is not sufficient to establish a breach of the manufacturer's or seller's duty as to the design of the product." *Id.* at 70-71. In *Ingersoll-Rand Co. v. Rice*, Ky.App., 775 S.W.2d 924 (1988), the Court of Appeals also concluded that a strict liability design defect case involving an oil drilling rig could not be submitted to the jury without sufficient proof that "a different design would have been feasible and would have prevented [the plaintiff's] injury." *Id.* at 929. Recently, in *Sand Hill Energy, Inc., supra*, at 506-07, Justice Cooper in a dissenting opinion stated that Ford was entitled to a directed verdict because the plaintiff failed to present any competent evidence of a reasonable alternative design.
>
> In *Nichols v. Union Underwear Co.*, Ky., 602 S.W.2d 429, 433 (1980), this Court stated that the test is whether an "ordinarily prudent company ... being fully aware of the risk, would not have put [the product] on the market." An ordinarily prudent company, with full awareness of the risks of its product, evaluates and weighs those risks to decide whether to put the product on the market as designed. A decision not to put the product on the market as designed leaves the company with two options–to use a safer alternative design, or not to put the product on the market at

> all. The Reporters' Note to the RESTATEMENT (THIRD) OF TORTS: Products Liability, § 2 cmt. d (1998), observes that Kentucky applies a risk-utility test in design defect cases. After examining Kentucky decisions as *Nichols, supra, Rice, supra,* and *Montgomery Elevator Co. v. McCullough*, Ky., 676 S.W.2d 776 (1984), the Restatement (Third) characterizes Kentucky as one of several jurisdictions that "apply a risk-utility test for defective design, thereby implicitly requiring proof of a reasonable alternative design without explicitly doing so."

*Id.* This discussion suggests that evidence of a feasible alternative and safer design is required to prove most product design defect claims. Since the *Toyota Motor* decision, no other Kentucky courts have addressed the issue.

No logical reason suggests that the rule from *Toyota Motor* should be limited to airbag cases. While the crashworthiness of an airbag is certainly different than the risk of an allergic reaction from latex gloves, the two require similar product liability analysis. Each product has significant market and public safety value. No one has suggested that either should be excluded entirely from the market. *See id.* Thus, in each instance, to find that a particular existing product is defective, the jury must consider evidence of whether a safer, feasible and acceptable alternative design is available.

In the most extreme circumstances, Plaintiff might also show latex gloves are so extremely unsafe that, even with a warning and without a feasible alternative, they simply should not be marketed at all. *Restatement (Third) of Torts: Products Liability* § 2, cmt. e (1998). As that comment illustrates, cases typifying this rule might involve dangerous toys with extremely low utility but high danger. These circumstances do not apply here. No one appears to doubt that some type of latex glove protection is necessary for medical workers.

This Court can only conclude that in a claim concerning latex gloves, Kentucky courts

would require proof of alternative, feasible and safer design in order for the jury to find that the existing design is defective. Without such evidence, the jury would have no basis for holding Defendant liable for its decision to design or market a particular kind of product.

### III.

Plaintiff argues that Kentucky courts have not resolved "what is sufficient proof of a defect as it relates to latex gloves" and that the Court should look to an earlier Supreme Court of Wisconsin case for guidance. *See Green v. Smith & Nephew AHP, Inc.*, 629 N.W.2d 727, 752-55 (Wis. 2001) (where the Supreme Court of Wisconsin rejected the manufacturer's argument that it could not be held liable simply because some persons suffer allergic reactions to its latex gloves). While *Green* is an interesting case, this Court finds no reason to follow it here. Some of the proof in *Green* was different than that available here. The primary legal issue was significantly different also.[7] Most important, as Plaintiff acknowledges, *Green's* analysis of Wisconsin products liability law demonstrates differences with the requirements under Kentucky law. Simply because *Green* happens to concern latex gloves does not make its analysis preferential to *Toyota Motor*. The *Toyota Motor* court did not have occasion to adopt, nor did it adopt, any analysis from *Green* that would favor Plaintiff here. Rather, it explains Kentucky's product liability proof requirements clearly enough for this Court to apply and follow.

Plaintiff also suggests a number of reasons why Dr. Gershwin's report might be adequate even under *Toyota Motor*. The Court respectfully disagrees. Dr. Gershwin's report establishes that latex gloves cause allergic reactions, that powdered gloves pose greater risk than non-

---

[7] *Green* was primarily a warnings case. This Court has already decided that federal preemption bars any inadequate warning claim.

powdered gloves, and that latex allergies afflict a substantial number of health care workers. That powdered latex gloves are more dangerous to users than non-powdered gloves does not make them unreasonably dangerous. Dr. Gershwin does not discuss whether non-powdered gloves are a safer feasible alternative to powdered gloves. Nor does he suggest that powdered gloves are so dangerous that no amount of warning could make them reasonably safe. In short, Dr. Gershwin's actual opinions are limited to comparative medical causation. Dr. Gershwin's report alone does not provide enough information for a reasonable jury to assess whether a prudent manufacturer should market a different type or design of latex glove.

Plaintiff also argues the significance of the prior proceedings in the Multi District Litigation case based in the Eastern District of Pennsylvania. Indirectly at least, she suggests that Judge Edmund Ludwig has already approved Dr. Gershwin and his opinions. Of course, that is not exactly true. In the MDL proceedings, Judge Ludwig qualified Dr. Gershwin to give medical opinions about the risk of sensitization or allergic reactions to powdered and non-powdered latex gloves. Those opinions are quite similar to those which Dr. Gershwin expressed in his initial report here and which this Court has already allowed and analyzed.[8] However, Judge Ludwig did not qualify Dr. Gershwin as a product expert and none of his opinions involved that expertise.[9] Plaintiff also asks the Court to reconsider its decision striking that late affidavit because Defendant should have known Dr. Gershwin would offer such opinions

---

[8] Judge Ludwig essentially approved the following opinions of Dr. Gershwin: "(1) NRL glove exposure increases the risk of sensitization or allergy; (2) health care workers who wear NRL gloves are at an increased risk for sensitization or allergy; (3) powdered NRL gloves increase the risk of sensitization or allergy in comparison with non-powdered gloves; (4) the level of protein or allergen in a NRL glove is associated with the risk of sensitization or allergy; and (5) a dose-response relationship exists between latex glove's use and the development of sensitization."

[9] In his untimely affidavit, Dr. Gershwin suggested he might offer testimony that powder is an unnecessary component of latex gloves.

because he has given such opinions in the Multi-District Litigation case. The Court concludes that it is fair only to consider the opinions set out in Dr. Gershwin's report provided to Defendant, not those that he may have given at different times and places. The Rule 26 expert disclosure rules would be purposeless were such a practice routinely allowed.

Plaintiff also asks the Court to consider evidence produced by Plaintiff's Steering Company for the Multi-District Litigation case. Specifically, Plaintiff offers: another physician's report of how latex gloves, particularly powdered gloves, cause allergic reactions; internal documents and deposition testimony from Defendant evidencing an awareness (prior to Plaintiff's injuries in 2000) that powdered gloves pose greater danger than non-powdered gloves, as well as an intent to remedy the problem of latex allergens; evidence that Defendant marketed a non-powdered glove prior to 2000. Once again, none of this evidence was produced in a timely manner in this case. That evidence may exist somewhere, even in a related proceeding, will not benefit a party unless produced in a timely manner in the case at hand. The physician's report is simply cumulative of Dr. Gershwin's report. Judge Ludwig discussed other witnesses who did possess engineering and manufacturing expertise. However, Plaintiff did not list any of these other witnesses as part of her case. Indeed, Plaintiff has not argued that such other expert testimony referenced in MDL proceedings should be considered here. The Court sees no basis for doing so.

       The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record